v. Stonemor INC Good morning, or good afternoon, your honors, and may it please the court. My name is Seth Kennedy on behalf of Teamsters Local 469, and may it please the court, I'd like to reserve three minutes for rebuttal. Okay, got it. The arbitration award issued by Arbitrator Lisa Charles on January 31st, 2022 should be entitled to deference and should have been confirmed at the district court level. Arbitrator Charles did not exceed her powers under the contract and rendered a ruling that reasonably interpreted its terms. The award arises out of a contractual, collectively bargained... Yeah, we know your facts. We're with you on the facts, Mr. Kennedy. So let me get straight to the thing that I find challenging, which the district court was addressing. The contract itself says that the contract is finalized upon ratification. There was ratification. And the contract also says pretty clearly what the rule is once you've got the contract in place. And in front of the district court, there was an exchange where the district court asked, do you agree that on October 5th, 2020, the agreement was ratified and it became a binding agreement at that point in time? The union lawyer said, yes, your honor, which then prompted the court to ask, well, how can you say you have a valid agreement on December? You can't have it both ways. Why don't you tackle that very directly? If it's final on October 5th and that's the agreement and you've got a contract, how can it be the case that it's really not final until signature in December? Well, your honor, the agreement was final, or at least from the union's perspective, was final on October 5th. But within 48 hours of that agreement becoming final, it became abundantly clear that there was not a full meeting of the minds on a salient term. Then it couldn't be a contract. I mean, by definition, a final contract represents a meeting of the minds. And you had a final contract at ratification. Now, a desire to renegotiate the contract, how does that change what the contract itself calls for? So, your honor, I think a fair amount of that comes from the, and this is typical in collective bargaining, the parties had come to a number of tentative agreements that then needed to be reduced into their final form for the final draft contract. But we're not talking about tentative stuff here. We've just established there was a final contract on October 5th. That was said in the district court. It was said right here by you at the podium just now. There was a final contract. So, I'm wondering the same thing the district court was wondering, which is, if there's a final contract, why aren't you bound by all the terms of the contract instead of just the terms you like? If you're bound by all the terms of the contract, you're in the grievance provision just as much as you're in the wage provision. You're in it. No? You are, your honor. And at no point has the union argued that the grievance provision didn't apply. What the union argued before the arbitrator and what the arbitrator found and agreed with was that the union's conduct and the employer's conduct during the bargaining process and in the weeks and months that immediately followed the ratification of the contract rendered it such that under the grievance provision, under the arbitrator's interpretation in light of the context of the party's conduct, that the grievance was timely under that contract provision. It wasn't that the grievance provision didn't apply. So let's just tease that out though. I mean, if we've got 10 days to file a grievance and we've got the 10 days starting on October 5th, 2020, that gives you until, you know, depending on if you count the first day or the second day, you know, there's ways to count. Do you want to count weekends? You know, there's all sorts of different ways to count. But it just, under any way of counting, I just don't know that you can get your 10 days hitting you in January 2021. And as the arbitrator lays out in her award, she began the 10 days running from the first time that the employer included the agreed upon wage language in any proposal. It happened to be the final executed contract. It could have been an interim proposal. But from October 5th until December when the contract got put into its final form, there had been no demonstration on the employer's part that it intended to include or adhere to the wage provision as was included. So, I mean, that's a little bit oblique to my question because the question was, how do you get 10 days from October 5th, 2020 to January? I think it's January, like January 5th-ish. That's a fair figure. So, basically what you said, if I heard you, if I'm kind of just thinking about this, it was, no, forget ratification date. That's not a good start date anymore. What the arbitrator did and what the arbitrator found is the triggering date was a point in time in late December. And that should be the start date instead of the ratification date, which is the date they find out. Is that kind of what you're saying? That the arbitrator, you hate to say this because it cuts against your case, ignored the ratification date as final, picked a new date that was reasonable, that she thought was reasonable, and started from there. But if that's what's going on, that's kind of hard. That gets to ignoring the term of the contract, which says ratification is final and that's the day it starts. And, your honor, I don't think I would classify what the arbitrator said or did as ignoring the ratification date. Rather, I think it was an acknowledgment of the fact that negotiation, ratification, and contract interpretation, particularly in the context of collective bargaining, don't happen in a vacuum. And that ratification... But the 10 days, that may be true, but the 10 days is tied to finality, which is tied to ratification. Am I wrong? Well, the 10 days is tied to the violation, your honor. So the employer proposes a couple of different dates that could be the date of the violation. The arbitrators... Which gets you to December, right? That's correct, your honor. Their position is, we paid you what we said we were going to pay you, and we told you why we were paying what we were going to pay you. So as soon as you got those checks, that's the latest you could possibly say, we didn't know what was going on. You, the union members, I mean, you know what I'm talking about, your clients, the union members, were clearly on arbitrator just kind of made up a new date. She came up with a reasonableness exception. She said it was reasonable for them to wait. And if that's her rationale, it leads me to ask, well, where's the reasonableness exception in the grievance procedure? Well, your honor, there is no reasonableness exception in the grievance procedure. Where the reasonableness comes in is the way the parties were behaving, the context with the It was drafted. That's the point. I mean, it was like, you guys might have been doing some cleaning up stuff in terms of, you know, how you wanted it to look on a page, but the grievance procedure, it didn't change, did it? The grievance procedure was what it was on October 5th, and it was still what it was in December, right? That's correct. Okay. So you had 10 days, and that makes one wonder how you can reasonably read 10 days to mean something other than 10 days, especially when the grievance procedure says expressly in it, time is of the essence. That was agreed upon. These are the timeframes, and time is of the essence. How can an arbitrator reasonably read that to mean time really isn't of the essence because you guys were still talking about stuff? Well, your honor, time being of the essence was certainly agreed to, and the parties continued discussions following the ratification and attempts to break that language down, treated it with time being of the essence. They were engaged in formal federal mediation. They were continuing to exchange contract proposals, and the record before the arbitrator and the exhibits presented to the district court fairly established that there was a greater degree of urgency on the union's part even than on the employer's part to get this matter resolved. I think it's also important to note in one of the cases that the employer cites here, the Granite State Distribution Incorporated case before the NLRB, the employer cites to that case to establish that subsequent efforts to modify terms are not inconsistent with the existence of the previously arrived at agreement, but that case arises out of an to a ratified agreement with the union. Yeah, here we've got a final contract. Everybody in this room seems to agree that there was a final contract on October 5th. So that's why I'm asking the questions I'm asking, but let me ask it this way. The arbitrator seemed to say a second thing after saying it was that the grievance didn't have to be filed during negotiation because there was negotiation going on. I mean, it seemed to me as if the arbitrator was actually saying the same thing twice. Was that just another way of saying it was reasonable to do what the union did, that is to wait to file the grievance? I mean, was that the bottom line here that the arbitrator was making one statement about reasonableness and that was basically it? Do you understand what I'm trying to ask? I might ask it. I'm not sure I do, Your Honor. Okay. Well, let me try it again if I can. The arbitrator's decision, in essence said, seemed, I mean, at least an argument that's being made by the other side, seems to be pinned to some idea that this really didn't, there wasn't a final contract until execution. If that's true, then we're just dealing with a mistake about finality, right? If that's really what the arbitrator was doing. I'm still not sure I quite understand your question, Your Honor. The district court looked at what the arbitrator did and the arbitrator said, we didn't have to, it was okay for you not to grieve until the thing was signed at the end. It seemed like the arbitrator was saying, in effect, you don't have a final agreement until execution because you're still in negotiation. If that's true, it looks like the arbitrator is changing the finality date. It looks like there's an error about when the thing is final. Is that true or not? Was the arbitrator just mistaken about the finality date or is something else going on here and that something else is the arbitrator saying, even though the contract was final on October 5th, it's okay and reasonable for you, the union, to keep negotiating with this because I think it's reasonable when you're fighting about the wages. Yes, Your Honor. I don't think it was a mistake of when the agreement became final. As you can see in a case like Southwest Airlines, there are arbitrators who will mistakenly say the contract's not final until it's executed and that's not what the arbitrator said here. What the arbitrator said here was the union ratifies the agreement on October 5th. The cosmetic drafting cleanup, which actually materially alters the substance of the wage article and when the union then says, no, we want to stick with the original language, the employer's response wasn't, okay, well, we'll just sign it, grieve it, we'll move on. They did say grieve it and we'll arbitrate it, but they then also went into voluntary mediation and then continued in these drafting discussions and what makes the agreement on the wage provision specifically final isn't the execution of the complete contract, it's that that's the first time that after ratification that the employer says, fine, that's the language, we'll use that language. Okay, I'm just going to quote this for you and maybe you've answered it already. This is from the arbitrator's decision and I read this as maybe having, saying two different things but maybe they're saying the same thing twice. It is reasonable that the union would ensure that the TA language was incorporated into the CBA before it filed the grievance asserting that the employer violated the CBA. That's the reasonableness statement. Then she says, moreover, the union was not required to file a grievance while the parties were continuing to clarify and negotiate the provisions of the CBA until the CBA was fully executed. Now I wondered whether that meant she just was mistaken about December 29 being the finality date as opposed to October 5th. You're saying no, she wasn't confused about that. If that's true and everybody understood October 5th to be the final date, then where in the contract, where in the contract is there anything that would override the grievance provision and allow her to say the union was not required to file a grievance until the thing was signed? Where would we find that in the agreement or how would we say it draws, that conclusion is drawn from the essence of the agreement? Your Honor, I don't read that portion of the arbitrator's award as saying that execution was necessary before a grievance could be filed. I think it colors her explanation of what made the union's conduct reasonable under the circumstances, but I think the portion of that paragraph that comes before her assertion that the grievance was filed reasonably based on the circumstances and discussing how there was no acknowledgment between ratification and execution by the employer that that language in the wage article was what was going to be in the contract. Okay. All right. Thanks very much, Mr. Kennedy. We'll have you back for rebuttal. We'll hear from you before counsel for Stonemore. Good afternoon, Your Honors, and may it please the court, Leah Mintz on behalf of Stonemore. To pick up, I think, on your question, Judge Jordan, about what the arbitrator was actually deciding here, I think there are two interpretations. One is the first that you were kind of pinning yourself, or maybe not pinning, but positing might be, which is that there was a reasonableness standard and she just kind of said it one way, and then she changed her language a little bit and said it another way. I think the other way to interpret it is that she made two separate conclusions. One, that there was this reasonableness exception or loophole that could be read into the contract. Or two, the determination that it was the execution that was the governing date, not the ratification. And I think, importantly, either one of those meets the high burden that we admittedly had to show to vacate this arbitration award. Because in the first instance, if it was a reasonableness determination, as Your Honor pointed out, the contract does not have a reasonableness exception. In fact, it says time is of the essence. Let me ask you this, Ms. Mintz. How was Stonemore harmed here? You had a contract on October 5th. And on October 6th, you went back and said, we want to change the language. And they said, no, we're not going to change the language. And at the end of the day, you left the language the same, even though in that October 6th or 7th exchange where you said, hey, we need to change the language. You, the client's representative, the client's attorney, not necessarily you, said, read literally, this would mean you'd have to get, we'd have to give everybody a wage bump right now. And the union said, yeah, that's right. So I guess what I'm for being told, yeah, you got to live with the contract language. I mean, this sort of idea I was pressing on Mr. Kennedy, which is you made your deal, live with your deal. It can be put to Stonemore too. You made your deal and admitted it in writing to the other side that by the clear terms of the agreement, you'd owe the money for a raise per the wage agreement. And then you just said, no, we're not doing it. How does that work? Why shouldn't the arbitrator's decision stand? Because you're just told, you made a deal, stop whining about it. Well, I take your Honor's point. I would say first, just on the actual email, there was not necessarily an admission that there was a... I can read it to you. Well, we realized that this could be interpreted in a way that was not how we actually thought we were negotiating. But even putting that aside, the reason why it matters is because there is the underlying dispute about the wage provision, which is not before the court. What's before the court is purely the grievance timeliness issue. And that, as your Honor was asking Mr. Kennedy, there is no dispute about what the language of the grievance procedure was. It specifically said you have to So just to tease that out, right? Like if the arbitrator said 10 days, we don't count weekends and holidays. That's perfectly good, right? That 10 days could turn into 17, you know, there's Columbus Day, maybe you could get a couple weekends. It could be pretty fast. 10 could actually be... And under the high standard that you're under, you just have to shrug and say, you know what? That is not a manifest disregard of the agreement. It's not the rule we wanted for 10 days, but maybe that's a way to read 10 days. And you would probably say, we can't meet the test. I think that's right, because that would be actually an attempt to look at the language, interpret it. What do we mean by 10 days? There are statutes that define how we count days. You know, there is an interpretive issue there. That you couldn't overcome. You've agreed to have an arbitrator review it. The arbitrator picks a number that's really 17, and the answer is, yeah, it was interpreted. So let me just tease this out a little bit more. What if the arbitrator went like this? Well, I'm looking at 10 days, and I know that sometimes one reading of 10 days is to exclude weekends and holidays, and I think that's a good idea. I also think that there's other reasons that 10 days should kind of not count. We should toll it. We should do other things like this. And so I'm going to still count 10 days, but I'm going to toll the period in between when you kind of notice that you got a problem until you finalize that. So maybe by the time we get to late December, there's only six days left or four days left. But if the arbitrator said, you know, I'm still reading 10 days. I'm just going to stop the clock on some of these. And that's not entirely uncommon in certain areas of law. Would you sit there and say, well, shoot, that still looks like you're trying to give some reading to the 10 days. It's not an entirely manifest disregard. It's just when one day cycles over to the next. Well, I think that does cross into that. Tolling would? Tolling would because of the time is of the essence provision. So there was an agreement that we are going to do this as fast as possible. 10 days. Sure, there might be a dispute about how exactly you count the 10 days. But to just throw out the 10 days or say, actually, we're not going to be applying the 10 days because of some equitable considerations is not something that's actually bound by the term, by the language. And that if there's any kind of lodestar or from this court's precedent, it's that when you're not actually looking at the language of the contract itself, that is when you have overstepped your authority as an arbitrator. And it's this court's duty to start stepping in and reining in that exercise. And I would point this court to language in the court's opinion in the Sitka Asphalt case, which says, an arbitrator's opinion and award based on general considerations of fairness and equity, as opposed to the exact terms of the CBA, fails to derive its essence from the CBA. And in that case, the court recognized that the arbitrator's award had to be vacated because of that fairness and equity considerations not being tied to the contract. So to answer your Honor's question, we're getting into these reasonableness considerations or tolling considerations. We've crossed the balance from actual contract language. So we're in that realm of, I think the case law says, the arbitrator's own brand of industrial justice. Yes. And so if, even if it's saying, hey, we're going to count, we're going to toll day six to day seven by two weeks, you say, no, you can toll it for weekends, you can toll it for holidays, that might be acceptable. But you can't toll it for kind of a fairness based reason based on the merits of kind of what you're trying to work out. And because the tolling, as your Honor said, for holidays and weekends is not tolling. It's interpreting words. So there's a difference between saying, I think that's what these words mean, versus I don't care what the words mean, I'm imposing something else. And that's what the arbitrator did here. She said, I don't care about the 10 days because I think it was reasonable. I think the conduct of the parties made some kind of equitable tolling that I'm, you know, she didn't use those words. But that's where the disconnect is. And that's when an arbitrator crosses that broad line of authority into. Well, if she had, if she had said, you know, every paycheck represents a new wrong. It was wrong for you to do this to start with. And every paycheck is a new wrong. Would she be drawing her interpretation from the contract itself? Even if we thought that was a mistake in application of the continuing violation doctrine? I think it would be a closer case that she would actually be dealing with the question of what counts as an occurrence. But, and that is, again, closer to the world of contract interpretation. Even though I think it creates its own problems with this court's precedent and with the language in the contract, again, saying that time is of the essence. Again, saying that the arbitrator's jurisdiction is limited in ways that she can't add to, subtract, modify, amend, or do anything to vary the terms of the contract. So, and I know that the continuing resolution, excuse me, continuing violation theory came up in the briefing in this case. And it was actually presented to the arbitrator. And she didn't decide to rely on it. So I know there's been a suggestion that this court should somehow fix the arbitrator's decision by relying on something that she did not. And I think that's not an appropriate exercise for this court to be doing for a number of reasons. Including, again, the Sitko case saying that it's not the role of this court to draw inferences that the fact finder did not. And it's not, and pointing also to the Brentwood Medical Association case, which basically said when there are four different independent grounds that the arbitrator based a decision on, and one of them is bad, we can kick that one out and keep the three that worked. Because those were expressed findings and expressed bases. But, and the court said this in footnote seven of that decision, if the arbitrator had only given the one that we all agree was just a manifest disregard outside the authority. If that didn't- Did you argue manifest disregard of the law? I think our primary position is manifest disregard of the language of the contract itself. I think there's also manifest disregard of the law from particularly the MacTrux case, which again just reinforces the point that was already in the language of the tentative agreement saying- MacTrux talks about how there has to be a meeting of the minds. And certainly from the argument that the union's making, the assertion seems to be, yeah, we thought there was a meeting of the minds, but clearly there wasn't a meeting of the minds. Because Stonemore turned around the next day and said, change this language. We're not going to give you a raise right now. So there really never was a meeting of the minds. And the negotiating going on meant that things truly weren't final until they were final on December 20, when everybody actually signed something. Is that contract interpretation? Well, I think it's not contract interpretation. And what MacTrux says is that ratification is generally the sine qua non of the existence of the contract. And we've heard today that continues to be true. So October 5th is the date that everyone has agreed to as being the date that this wage provision actually went into effect. I mean, the wage provision that we're fighting about is also the provision that required Stonemore to make a base pay adjustment and to pay bonuses. And again, it is actually undisputed. And the arbitrator said it was undisputed that those provisions were abided by. So again, we're in this world where the TA is final because it was ratified. The wage provision itself, the wage provision TA, is final. And then there's a dispute about what a term means. And there's an effort to clarify it. And there's some back and forth. And as this court has recognized in non-union cases, when you have a final agreement, which typically outside of the union case is a signed contract, but here it's just the TAs, and some party says, hey, wait a second. That's not what I thought I agreed it to. That's a contract defense. It's not actually a determination that there was never a meeting of the minds in the first place. So there was a meeting of the minds. There was a later dispute on interpretation. And under the plain terms of the grievance procedure, those interpretive disputes also go to the arbitrator subject to the 10-day limit. And that 10-day limit. One wonders what prompted the letter in the first place. Would we all be sitting here if a lawyer hadn't sent that letter? Yeah. It's a question I've wondered about. And I think it was honestly a good faith effort to say, look, the words aren't what we agreed to. Here's the stuff that we thought we were saying. They were the words you agreed to. Right. Yeah. Sorry. Yes. The words. We just didn't think we'd give you a raise in September and October. That's basically what they're saying. We thought we'd give you a raise maybe in September then October next year. But we didn't think we'd give you both September and October this year. Looks like we wrote it that way. Can't believe we wrote it that way. Please interpret it the way we meant it. The answer is no. We negotiated hard for this. That's what we wanted. We want two raises in a month's time. We're not letting go. Right. And I think, honestly, it was a good faith effort to bring the issue to attention, to try to avoid this kind of four years later, almost at this point, just continuing to argue about it and hoping that the parties could say, oh, yeah, this is actually what we meant when we said those words. But the reality is the words were what they were. They did not change, even though Stonewall did ask for it to change with the consent of the union. The union said no. We were stuck with the language. But it was still incumbent on the union, who had ample notice that this was a real, live dispute, as early as mid-October, to come forward and say, all right. And as late as October 30th, right? You pinned the latest date as October 30th when the payment was made? I think that's the absolute latest when we have checks on the record that say, yep, you didn't get that October 1 wage increase. I think it could be earlier. It could be the date that our counsel said, file your grievance. We're not paying you. But any of those dates, this court doesn't need to pin one date, because any of those is well beyond the 10-day limit. Thank you very much. Thank you, Your Honors. Kennedy will hear your rebuttal. Thank you, Your Honors. And I want to begin with some of the explanation that you just heard from the employer about why the letters were sent and the clarifying efforts were made in the first place. They were good faith efforts to try to avoid being here. And that is a perfect description of exactly what the union was doing. When this dispute came up, the National Labor Relations Act requires, as a component of the duty to negotiate in good faith, the execution and reduction to writing of a final collective bargaining agreement. And when the union asked for a collective bargaining agreement, which included the agreed-upon wage provision in it, it was the employer that accused the union of the utmost of bad faith for insisting on including its agreed-upon language in the collective bargaining agreement. Yeah, so you heard my question to Ms. Mintz. You could reasonably look at the Stilmore people and say, knock it off, right? And if we were looking at the merits of this, that would be a different kind of a discussion we would be having. But we're not looking at the merits. The only thing we're looking at is, was there a contract? And did the grievance procedure, which was part of that contract, get abided by? Because if it wasn't, then that's sort of game up, isn't it? Even though the union was perfectly within its rights to say, hey, you're big kids. We don't have to withdraw a position which you yourself acknowledge is at least reasonable if the words are read the way they're read. So I guess what I'm wondering is, the pitch you're making seems to be kind of a merits pitch, but we're not here on the merits, are we? No, we're not, Your Honor. We're here on timeliness. And as this court held in Machinist versus Howe, timeliness of a request for arbitration and adherence to the timelines in the grievance step procedure is a matter for the arbitrator, and that these are matters which are not decided in a factual vacuum and which are peculiarly, for an arbitrator, familiar with industrial and labor practices. Where could this arbitrator have possibly gotten the timeline she came up with without having read a reasonableness exception into the grievance procedure? I don't want to run over the same ground again, but when you say it's peculiar within the arbitrator's province, that's if the arbitrator is actually looking at the language. But she seems to be saying, the grievance procedure, there's a reasonableness exception here. It was reasonable for them to not abide by the timeline. And, Your Honor, again, I don't think her conclusion was that it was reasonable for the union not to abide by the timeline. It was starting the timeline later based on the union's reasonable conduct, which is perfectly in keeping with the axiom that the law abhors a forfeiture. Labor arbitrators, by and large, aim to rule on merits over procedure. And where there's any reasonable reading of things that can justify a ruling on the merits, arbitrators look to resolve that merits dispute. And here, it was a reasonable interpretation of the grievance procedure, not to overuse the word reasonable, to consider the reasonableness of the union's conduct up against the employer's conduct in the couple of months while the parties were trying to amicably resolve the dispute, and not force a union one week into its first contract to jump straight to an adversarial arbitration proceeding when maybe mediation, maybe negotiation, maybe discussion could have sufficed. OK. Thanks very much, Mr. Kennedy. We have the case under advisement. We'll go ahead and recess court. Thank you, Your Honor.